## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERESA DANNER,** | : | **Civil No.  4:25-CV-285** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

This Social Security appeal involves a familiar challenge to a decision denying the plaintiff's claim. The plaintiff in this case, Teresa Danner, challenges the decision of a Social Security Administrative Law Judge (ALJ) which found that she had not met the exacting standards for disability under the Social Security Act. In particular, on appeal Danner insists that the ALJ erred in considering the medical opinion evidence by addressing two conflicting medical opinions as one and failing to adequately articulate which limitations were deemed persuasive and which were not. Upon review, we discovered that one of these medical experts opined that Danner was subject to a limitation that has recently resulted in a rising tide of remands – this expert opined that Danner could perform simple, one-to-two-step

1

tasks. Moreover, the ALJ did not incorporate or address this limitation in the residual functional capacity (RFC) assessment, despite finding the opinion of this expert persuasive, a decision we have deemed to be reversible error in the absence of any showing of harmless error. Whitney v. Bisignano, No. 4:24-CV-1950, 2026 WL 522922, at *10 (M.D. Pa. Feb. 25, 2026);  Cruz v. Bisignano, No. 1:24-CV-1966, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025); Michelle M. v. Bisignano, No. 3:23-CV-02163, 2025 WL 2713737, at *7 (M.D. Pa. Sept. 23, 2025); Warren v. Dudek, No. 1:24-CV-635, 2025 WL 1168276, at *6 (M.D. Pa. Apr. 22, 2025); Shipman v. Kizakazi, No. 3:22-CV-00636, 2023 WL 5599607, at *10 (M.D. Pa. Aug. 29, 2023).

Nonetheless, in considering the arguments of the plaintiff, we are enjoined to consider any errors in the ALJ analysis in the factual context of the case applying a harmless error analysis where remand is appropriate only where the error likely affected the outcome of the proceeding. In this case, the undisputed testimony of a vocational expert (VE) insulates the ALJ's decision from remand under this harmless error theory, since this vocational expert testified that the plaintiff could still perform work that exists in the national economy even considering the most conservative limitations opined by the medical experts, including the one-to-two-step limitation.

Moreover, while the plaintiff also challenges the ALJ's evaluation of her subjective symptoms, our review of this case is subject to a deferential standard of review, a standard of review which simply asks whether there is "substantial evidence" supporting the Administrative Law Judge's (ALJ) determination. With respect to this legal guidepost, as the Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In the instant case, after an independent review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings as to the

plaintiff's subjective symptoms and any error with regard to the analysis of the medical opinion evidence was harmless. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

II.     **Statement of Facts and of the Case**

A. **Danner's Medical History and Expert Testimony Regarding Her Mental Impairments**

On April 15, 2022, Teresa Danner applied for disability insurance benefits under Title II of the Social Security Act, alleging disability beginning February 25, 2021.[1] (Tr. 19).  According to Danner, she was totally disabled due to a series of medical conditions, including PTSD, severe depression, severe anxiety, ulcerative colitis, nightmares, IBS, sleep apnea, ADHD, and Graves disease. (Tr. 168). Danner was born was born on August 3, 1978, and was forty-two years old, which is defined as a younger individual by the Commissioner's regulations, at the time of the alleged onset of her disability. (Id.) She had a college education and had previously worked as a corrections officer for the Federal Bureau of Prisons (FBOP) at the United States Penitentiary at Lewisburg (USP Lewisburg). (Tr. 37).

---

[1] Danner previously applied for disability benefits alleging an onset date of October 2016, when she left her prior employment. That application was denied, thus the alleged onset date in the instant application is the day following the denial of that application. (Tr. 67).

Danner's employment at USP Lewisburg is relevant to more than just the question of whether the limitations caused by her conditions precludes her from performing that prior job. Indeed, Danner testified that she was medically retired from USP Lewisburg at least in part due to trauma resulting from sexual harassment and discrimination she faced there. (Tr. 41-42). According to Danner, she was still in the process of suing the BOP for gender discrimination and sexual harassment. (Tr. 112). She testified that she is unable to be in contact with any men without freezing and having a panic attack due to past childhood trauma as well as her experience at USP Lewisburg. (Tr. 43-44).

The principal issues in this appeal relate to the ALJ's symptom evaluation and the evaluation of the medical opinion evidence in this case and particularly focus on the ALJ's treatment of Danner's mental impairments of PTSD, anxiety, and depression. With respect to these issues, the clinical evidence reveals the following:

The clinical record shows that Danner was treated for her mental health disorders throughout the relevant period by psychiatrist Dr. Michael Turk. Prior to the alleged onset date, at her initial psychiatric evaluation on August 3, 2020, Dr. Turk noted that she had seen a psychiatrist for a few years prior who had recently been arrested and his practice abruptly closed. (Tr. 726). Dr. Turk noted severe depressive symptoms, PTSD symptoms with possible psychotic features, significant

anxiety attacks, and probable agoraphobia. (Tr. 726). Danner also reported to Dr. Turk that a number of times a year she experienced manic symptoms of decreased need for sleep, hyper verbality, increased goal directed activity and disorganized manner and thinking due to racing thoughts, irritable angry mood but Dr. Turk noted that her depressive symptoms such as euthymic mood were mild. (Id.) Thus, Dr. Turk diagnosed bipolar disorder with severe depressive symptoms and some psychotic features, PTSD, and anxiety, but noted the symptomology she associated with ADHD could be related to her other impairments. (Tr. 727).

At this evaluation, Danner also referenced the trauma from the sexual harassment at her employer and childhood trauma playing into her PTSD symptoms and reported trust issues, severely impaired concentration, and being restless and easily distracted due to ADHD. (Id.) She also reported that her memory was impaired, she had a past suicide attempt and daily passive suicidal thoughts and had binge eating concerns. (Id.) On examination, Dr. Turk noted Danner displayed euthymic mood and anxious depressed attitude but was cooperative and pleasant, displayed appropriate affect, intact language and thought processes, full orientation, and fair insight and judgment. (Tr. 728). Nonetheless, he observed impaired attention span and concentration, anhedonia, depression, inappropriate guilt, self-deprecatory ideas, victimization, thoughts of helplessness and worthlessness but no

delusions or hallucinations. (Id.) Danner's psychiatric medications were adjusted and supportive therapy was recommended. (Tr. 729-30).

Dr. Turk's treatment records during the relevant period, from February 25, 2021, through Danner's date last insured, December 31, 2022, show ongoing depressive symptoms and anxiety but that her sleep was improving and ADHD symptoms improved with medication. (Tr. 750-820). It was also noted that her bipolar disorder was improving but ongoing and "in partial remission." (Tr. 754). Though she frequently expressed feelings of anxiety, depression frustration, guilt, and shame, (tr. 754, 756, 758, 771, 774, 784, 800, 825), and exhibited depressed mood her mental examinations were also almost entirely unremarkable showing intact attention span and concentration, cooperative attitude, and anxiety symptoms lessening and bipolar improving overall, particularly when she was on her psychiatric medications. (Tr. 784, 797, 800, 806, 810, 819, 825, 828, 837, 840, 843, 846, 849, 855, 857, 863, 869). There were only a few occasions her concentration and attention span were decreased, especially when experiencing manic symptoms. (Tr. 786-87, 793-94, 822). Nonetheless, overall, it appears from Dr. Turk's records that her bipolar was relatively well managed despite causing some limitations in her ability to maintain motivation and perform daily tasks. She also expressed an ability to go trick or treating, visit with family and friends for holidays, attend a birthday

party, interact with neighbors, and homeschool her children. (Tr. 783, 802, 808, 839, 856, 955).

By May 2022 Danner noted improvements in her ADHD, PTSD, and depressive symptoms, but stated that breakthrough symptoms did occur, and noted anxiety and agoraphobia were ongoing. (Tr. 851). Her bipolar was noted as improving overall. (Tr. 869). Treatment notes continued to show periods of improvement with better and worse days through the end of 2022 with examination notes remaining relatively unremarkable. (Tr. 917-950). By the end of the relevant period, Dr. Turk noted she was handling triggers to anxiety and panic better but that her anxiety could still get severe easily and maintained a moderate level of anxiety in general. (Tr. 949). He stated that her attention, concentration, and depression symptoms were ongoing but improving. (Id.) Thus, Danner's clinical history undoubtedly demonstrated that she struggled with anxiety, depression, PTSD, and ADHD, but that her mental status exams were overwhelmingly normal and she was still performing some normal activities of her daily life.

On this score, the ALJ highlighted her ability to perform many normal activities despite her impairments. As the ALJ summarized:

> Additionally, despite her testimony regarding severely limited activities of daily living, the record suggests that she retains greater functional abilities. First, in contrast to statements contained in her Function Report, the claimant had often noted organizing, cleaning, and

8

performing other household tasks at her treatment visits (Exhibits B1F/55 and B3F/142). Further, the records show that the claimant has been very involved with her children and their homeschooling during the relevant period (Exhibits B2F/27, B3F/119, and B8F/11). Moreover, there are indications that the claimant enjoys following organized sports and has attended minor league baseball games (Exhibits B1F/73 and B8F/2, 13). Although the claimant testified that she had to leave games early due to psychologically based symptoms or triggers, this allegation is not reflected in contemporaneous treatment notes.

(Tr. 24).

Given this fairly benign clinical history, the medical opinion evidence was particularly significant in determining whether Danner's multiple emotional impairments were wholly disabling. Notably, only two non-examining, non-treating sources opined regarding the limiting effects of these impairments.[2] Notably, neither of these experts found Danner's physical impairments to be disabling. Instead, on July 27, 2022, Dr. Roger Fretz opined that Danner would be moderately limited in all areas of mental functioning including understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Tr. 171). Specifically, Dr. Fretz opined that Danner would be moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended

---

[2] No treating source, including her treating psychiatrist Dr. Turk, completed a mental status assessment of Danner to accompany her most recent application.

periods, sustain an ordinary routine, work in coordination and proximity with others and complete a normal workday and workweek without interruption from her symptoms. (Tr. 173). He also concluded she would be moderately limited in interacting appropriately with the general public and getting along with coworkers or peers, but that she would not be limited in accepting instructions and responding to criticism from supervisors. (Id.) Moreover, Dr. Fretz opined that Danner would be moderately limited in her ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. (Id.) Dr. Fretz explained that Danner had some difficulty with social engagement and could misinterpret the intentions of others, was forgetful and had some difficulty with concentration and maintaining pace and may have some difficulty learning new material but that she was capable of performing simple tasks. (Tr. 173-74).

On reconsideration, a second State agency consultant who examined Danner's records reached different conclusions regarding the limiting effects of her mental impairments. On October 26, 2022, Dr. Virginia Carolyn Martin opined that Danner had only mild limitations in her ability to understand, remember, or apply information and adapt or manage oneself, but, like Dr. Fretz, considered Danner's limitations in her ability to interact with others and concentrate, persist or maintain pace to be moderate. (Tr. 181). Specifically, Dr. Martin opined that Danner had no

understanding and memory or adaptation limitations but was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination or proximity to others, and complete a normal workday and workweek without interruptions from her symptoms. (Tr. 183). Dr. Martin also concluded that Danner was moderately limited in her ability to interact appropriately with the general public and get along with coworkers or peers without distracting them but, like Dr. Fretz, opined she was not significantly limited in responding appropriately to supervisors. (Id.) Dr. Martin explained:

> The claimant's basic memory processes are intact. *The claimant can understand, retain, and follow simple instructions (i.e., perform one- and two-step tasks).* The claimant can make simple decisions and would not require special supervision in order to sustain a routine. The claimant can perform simple, routine, repetitive tasks in a stable environment. The claimant is capable of performing within a schedule and at a consistent pace.
>
> The claimant is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene. The claimant is capable of asking simple questions and accepting instruction. The claimant is able to interact appropriately with the general public. The claimant is able to get along with others without distracting them. The claimant can exercise appropriate judgment.

(Tr. 184).

Thus, without the benefit of a treating source's opinion, the ALJ was presented with two non-treating, non-examining sources whose opinions were both inconsistent with one another and internally inconsistent. On this score, while Dr. Martin concluded Danner had no understanding, memory, or adaptation limitations, she explained that Danner would be limited to simple one- and two-step tasks. Conversely, Dr. Fretz concluded that Danner was moderately limited in all spheres of functioning, but did not include any limitation to one-to-two-step tasks.

It was against this medical background that Danner's case came to be considered by the ALJ.

**B. The ALJ Hearing and Decision.**

Another unusual aspect of this case is that three hearings were conducted before three different ALJs before a decision was made. This series of hearings remains mysterious and unexplained, with each subsequent ALJ simply noting that the prior ALJ who heard the case was unable to issue a decision. (See Tr. 62, 97). Thus, Danner testified before these ALJs on June 13, 2023, (tr. 33-59), November 14, 2023, (tr. 60-93), and May 6, 2024. (Tr. 94-136). At the first hearing, the ALJ asked Danner if she would be able to perform the simple one-to-to-step jobs that had been identified in the previous decision denying her disability benefits. Danner testified that she could not do even simple one-to-two-step jobs if she is in contact

12

with people, specifically that she freezes up and has panic attacks when she interacts with any man due to her PTSD. (Tr. 43-44). At the hearing before the ALJ who ultimately issued the decision in this case, Danner also testified that she would be significantly functionally limited by her impairments. As the ALJ summarized:

> With regard to her functional limitations, the claimant testified that her short-term memory is poor, and she has significant difficulties focusing. She rarely leaves her home and has difficulties being around people. Her husband performs most of the daily activities including shopping, errands, cooking and housekeeping. The claimant lives in her pajamas and showers infrequently.

(Tr. 23).

A vocational expert (VE) also testified at the May 2024 hearing. The ALJ posed a series of hypotheticals to the VE, including limitations that were more restrictive than those the ALJ ultimately included in the final RFC. Even considering these more restrictive functional limitations, the VE identified occupations the plaintiff could perform. As the VE testified:

> Q. And I'm going to give you a series of hypotheticals. Assume a person of the claimant's age, education and work experience that can do the following. Individual can understand, carry out simple, routine repetitive one to two step tasks, and can sustain attention for extended periods of two hour segments, while maintaining regular attendance and being punctual within customary limits. No interaction with the public. And occasional interaction with co-workers but no tandem tasks. Can they do the past job?
>
> A. No, Your Honor.

Q. How about any other types of occupations and we can keep it at the light level?

A. Okay. Yes, Your Honor. Marker. DOT number 209.587-034. Number of jobs in the national economy 50,000. This is light with an SVP of 2. That of the mail clerk. DOT number 209.687-026. Number of jobs in the national economy 70,000. This is light, with an SVP of 2. And that of the garment sorter. DOT number 222.687-014. Number of jobs in the national economy 200,000. This is light with an SVP of 2.

(Tr. 56). Thus, the VE testified that even if Danner were limited to simple, routine, repetitive one-to-two-step tasks, she could perform the jobs of marker, mail clerk, and garment sorter.

Following this hearing, on May 13, 2024, the ALJ issued a decision in Danner's case. (Tr. 14-32). In that decision, the ALJ first concluded that Danner did not engage in substantial gainful activity during the period from her alleged onset date of February 25, 2021, through her date last insured of December 31, 2022. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Danner had the following severe impairments: a mental impairment diagnosed to include post-traumatic stress disorder (PTSD), agoraphobia with panic disorder, bipolar disorder, mixed anxiety disorder, and attention-deficit/hyperactivity disorder (ADHD). (Id.)

At Step 3, the ALJ determined that Danner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the

14

disability listing impairments. (Tr. 20-22). In considering whether her mental impairments were severe, the ALJ considered the "paragraph B" areas of functional limitations on which the State agency experts had opined. The ALJ seemingly adopted the limitations opined by Dr. Martin, concluding that Danner had mild limitations in understanding, remembering or applying information and adapting or managing oneself and moderate limitations in interacting with others and concentrating, persisting, or maintaining pace. (Id.) In so concluding, the ALJ cited to benign objective examination findings and reports in the medical record that she was capable of performing household tasks such as organizing and cleaning and was able to care for and homeschool her children during the relevant period. (Id.)

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of her impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform simple, routine, and repetitive tasks that are not at a production rate pace (*e.g.,* assembly line work). She can use judgement and deal with changes consistent with this type of work. The claimant is able to occasionally interact with supervisors and coworkers and never work with the public.

(Tr. 22).

15

In reaching this RFC, the ALJ considered her subjective statements regarding her symptoms and cast them against the objective medical evidence. In her analysis, the ALJ ultimately concluded that Danner's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the statements of the claimant . . . concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 23). The ALJ first summarized Danner's subjective statements about the limiting effects of her impairments, stating:

> When she initially applied for benefits, the claimant alleged an inability to work due to PTSD, severe depression, severe anxiety, ulcerative colitis, irritable bowel syndrome, nightmares, sleep apnea, ADHD, and Graves' disease (Exhibit 1E/2). In a July 2022 Function Report, the claimant reported that her impairments limit her ability to concentrate on simple tasks, interact with others, and retain information (Exhibit B4E/6). Furthermore, the claimant noted difficulties completing tasks, remembering, and understanding (*Id.*). With regard to daily tasks, the claimant indicated that she has difficulties preparing meals and performing household tasks (*Id.* at 2-4). However, she also reported that she is able to perform personal care items unassisted and shop for household essentials via computer (*Id.*). She enjoys watching television, playing electronic games on her phone, and socializing with others via text or email (*Id.* at 5).
>
> At the hearing, the claimant testified that she is currently forty-five and married to Shawn Danner for twelve years. She lives with her husband and her two children, Abigail, age ten, and Shawn Jr., age eleven. She has a valid driver's license but has not driven a motor vehicle for two years.

With regard to her functional limitations, the claimant testified that her short-term memory is poor, and she has significant difficulties focusing. She rarely leaves her home and has difficulties being around people. Her husband performs most of the daily activities including shopping, errands, cooking and housekeeping. The claimant lives in her pajamas and showers infrequently.

(Id.)

The ALJ then observed that the extreme level of impairment alleged by Danner was inconsistent with the objective record. At the outset, the ALJ determined Danner's treatment history did not support the extreme level of impairment which she described. Instead, as the ALJ noted:

[T]he record shows that the claimant has often reported improvement in response to her treatment. For example, at an October 2021 visit, the claimant noted that she was "doing well" and reported that she was taking her medications as prescribed and denied adverse side effects (Exhibit B2F/11). Likewise, at visits during September 2022, the claimant noted that her ADHD symptoms had improved on dextroamphetamine and Vyvanse, and that her anxiety symptoms were better on Xanax (Exhibit B8F/19, 22). Finally, at a November 2022 visit, the claimant noted that her attention, concentration, and depression symptoms were all improving (Id. at 31). She denied manic symptoms or psychosis but did report some situational stressors (Id.).

Likewise, in addition to these indications of subjective improvement, the claimant has often demonstrated benign signs on mental status examinations. For example, at a visit on May 16, 2020, the claimant had cooperative behavior, normal speech, appropriate appearance, intact orientation, intact memory, normal thought content, and adequate concentration (Exhibit B1F/2). Likewise, the claimant demonstrated similar signs on examinations performed during January 2021, December 2021, August 2022, and November 2022 (Exhibits B3F/27, 80 and B8F/11, 35). Finally, at an April 2023 visit, the claimant had

17

cooperative behavior, normal speech, goal directed thought processes, and grossly intact attention/concentration (Exhibit B10F/20).

(Tr. 23-24).

The ALJ also noted that, despite her claims of extreme limitations in her activities of daily living, the record evidence showed she was more capable than she alleged, noting:

> Additionally, despite her testimony regarding severely limited activities of daily living, the record suggests that she retains greater functional abilities. First, in contrast to statements contained in her Function Report, the claimant had often noted organizing, cleaning, and performing other household tasks at her treatment visits (Exhibits B1F/55 and B3F/142). Further, the records show that the claimant has been very involved with her children and their homeschooling during the relevant period (Exhibits B2F/27, B3F/119, and B8F/11). Moreover, there are indications that the claimant enjoys following organized sports and has attended minor league baseball games (Exhibits B1F/73 and B8F/2, 13). Although the claimant testified that she had to leave games early due to psychologically based symptoms or triggers, this allegation is not reflected in contemporaneous treatment notes.

(Tr. 24).

The ALJ also noted that Danner actually considered herself to be "retired" and left the workforce for reasons not related to her medical impairments, specifically referencing her ongoing EEO claim against her former employer. (Id.)

The ALJ then considered the meager medical opinion evidence in this case, addressing the opinions of Dr. Fretz and Dr. Martin in a vague, cursory, and brief

18

manner. The ALJ addressed these two opinions, which reached inconsistent conclusions regarding the full limiting effects of Danner's impairments, together as one in a single paragraph finding both of the opinions "generally persuasive." The ALJ explained:

> At the initial and reconsideration stages of the administrative process, the psychological consultants who reviewed the file, Roger Fretz, PhD, and Virginia Carolyn Martin, PsyD, opined that the claimant retained the ability to perform simple tasks but would experience some difficulties with social engagement, concentration, and learning new material (Exhibits B3A and B6A). I find that these opinions continue to be generally persuasive. Although these consultants are non-treating, non-examining medical sources, the limitations outlined in these opinions are supported by reference to the medical records available at these prior stages (Exhibits B1F-B7F). Moreover, while these consultants did not have the benefit of evidence received at the hearing level, including testimony received at the hearing, these limitations continue to be generally consistent with the evidence submitted at the hearing level.

(Tr. 24-25). This analysis seemingly credited the consistent portions of these expert opinions, that Danner could perform simple tasks with limitations in social engagement, concentration, and learning new materials, but failed to acknowledge or address the inconsistencies in these opinions, including the moderate limitations opined by Dr. Fretz in the spheres of understanding, remembering, or applying information and adapting or managing oneself and the opinion of Dr. Martin that Danner could perform only one-to-two-step tasks.

Having made these findings, the ALJ concluded that Danner could not perform her past relevant work but that there were other jobs that existed in significant numbers in the national economy that she could perform, including the occupation of Marker that the VE identified as an occupation Danner could perform even if limited to one-to-two-step tasks. (Tr. 26-27). Accordingly, the ALJ concluded that Danner had not met the stringent standard of disability set by law and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Danner asserts a two-fold argument attacking both the ALJ's symptom evaluation and consideration of the medical opinion evidence in this case. These issues are fully briefed by the parties and are, therefore, ripe for resolution.

Upon consideration, we find that the ALJ's assessment of Danner's symptoms was supported by substantial evidence. Further, while we agree with the plaintiff that the ALJ's assessment of the medical opinion evidence in this case was deficient, any error was harmless. Accordingly, we will affirm the decision of the Commissioner.

## III.   **Discussion**

### A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

21

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

23

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ

24

offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous

work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

26

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

28

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

C. **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is illustrated by those cases which consider analysis of a claimant's reported symptoms. When evaluating lay testimony regarding a claimant's reported symptoms we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide

30

"specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of

31

a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally

32

limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations

33

and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

### D. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer

34

give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

35

persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. When presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). However, the ALJ must still fully articulate the basis of this medical opinion evaluation. Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). It also follows that "when a medical opinion is found persuasive and contains a limitation to one- and two-step tasks, the ALJ is obligated to either: (1) include the limitation in the RFC and limit the claimant to reasoning level one occupations, or, (2) identify the substantial evidence that the ALJ is relying on in rejecting the limitation." Cruz, 2025 WL 2813882, at *8.

These legal benchmarks guide us in the instant case.

### D. **The Commissioner's Decision Will Be Affirmed**.

### 1. **The ALJ's Evaluation of the Plaintiff's Symptoms was Supported by Substantial Evidence.**

In the instant case, Danner first invites us to set aside an ALJ's findings concerning the severity of her symptoms resulting from her mental impairments. In considering Danner's arguments, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's evaluation of Danner's symptoms.

Danner argues that the ALJ's evaluation of her subjective symptoms was flawed and the ALJ's conclusion that her statements were not entirely consistent with the medical evidence was not supported by substantial evidence. However, our review of the ALJ's decision and the record as a whole reveals that the ALJ's evaluation of her symptoms complied with the regulations. On this score, while the plaintiff challenges the ALJ's reliance on her activities of daily living and benign

objective examination findings in assessing her subjective reports, these are precisely the types of factors the ALJ is empowered to explore in this evaluation. Moreover, our review of the record reveals substantial evidence supported the conclusions of the ALJ. At the outset, the ALJ noted that Danner's reported symptoms are at odds with the consistently benign mental status evaluations. In our view, the records of Dr. Turk we summarized above support this view, since during the relevant period her mental examinations were regularly normal, showing intact attention span and concentration, cooperative attitude, and anxiety symptoms lessening and bipolar improving overall. (Tr. 784, 797, 800, 806, 810, 819, 825, 828, 837, 840, 843, 846, 849, 855, 857, 863, 869).

Further, the ALJ stated that:

[D]espite her testimony regarding severely limited activities of daily living, the record suggests that she retains greater functional abilities. First, in contrast to statements contained in her Function Report, the claimant had often noted organizing, cleaning, and performing other household tasks at her treatment visits (Exhibits B1F/55 and B3F/142). Further, the records show that the claimant has been very involved with her children and their homeschooling during the relevant period (Exhibits B2F/27, B3F/119, and B8F/11). Moreover, there are indications that the claimant enjoys following organized sports and has attended minor league baseball games (Exhibits B1F/73 and B8F/2, 13). Although the claimant testified that she had to leave games early due to psychologically based symptoms or triggers, this allegation is not reflected in contemporaneous treatment notes.

(Tr. 24). Despite the plaintiff's arguments to the contrary, upon review, the medical records do reveal that Danner was able to visit with family and friends for holidays, attend a birthday party, interact with neighbors, and homeschool her children. (Tr. 783, 802, 808, 839, 856, 955).

Further, while we recognize that the ALJ could not rely upon periods of improvement in her symptoms to wholly reject her subjective complaints, see Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014) ("[W]hile discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment"), the effectiveness of medication and treatment are relevant factors to the symptom analysis. On this score, the ALJ noted:

> [T]he record shows that the claimant has often reported improvement in response to her treatment. For example, at an October 2021 visit, the claimant noted that she was "doing well" and reported that she was taking her medications as prescribed and denied adverse side effects (Exhibit B2F/11). Likewise, at visits during September 2022, the claimant noted that her ADHD symptoms had improved on dextroamphetamine and Vyvanse, and that her anxiety symptoms were better on Xanax (Exhibit B8F/19, 22). Finally, at a November 2022 visit, the claimant noted that her attention, concentration, and depression symptoms were all improving (Id. at 31). She denied manic symptoms or psychosis but did report some situational stressors (Id.).

(Tr. 23-24). Substantial evidence supports the ALJ's conclusion that her symptoms were improving, since Dr. Turk's records indicate periods of improvement with better and worse days through the end of 2022 with examination notes remaining

relatively unremarkable, (tr. 917-58), and by the end of the relevant period, Dr. Turk

noted she was handling triggers to anxiety and panic better and that her attention,

concentration, and depression symptoms were ongoing but improving. (Tr. 949).

Thus, the effectiveness of her treatment was squarely before the ALJ and a relevant

consideration in this analysis.

As to the plaintiff's argument that the ALJ improperly indicated that she

separated from her employment for non-medical reasons by highlighting her

retirement and the existence of the EEO complaint, the ALJ considered this in the

context of the credibility of the claimant. As the ALJ explained:

> Further, the record documents several items that call into question the
> veracity of the claimant's allegations. Most notably, the claimant
> testified that she discontinued working as a corrections officer on
> October 31, 2016, for reasons not related to her medical impairments.
> Consistent with her testimony, her medical records contain frequent
> references to the progress of her EEO claim (Exhibits B1F/13, 89 and
> B3F/107). At the same time, the claimant has often described herself as
> "retired" at treatment visits (Exhibits B2F/25, 27 and B3F/67).

(Tr. 24). While the plaintiff's argument is that the existence of the EEO claim should

have only bolstered her allegations of symptoms from PTSD, "as a legal matter

"[t]he ALJ, ..., 'has the right, as the fact finder, to reject partially, or even entirely,

[a claimant's statements] if they are not fully credible." Love v. Astrue, No. 1:12-

CV-1923, 2014 WL 4915998, at *9 (M.D. Pa. Sept. 30, 2014) (quoting Schuster v.

Astrue, 879 F.Supp.2d 461, 470 (E.D.Pa.2012)) (internal quotation omitted). In our

view, whether the claimant left her employment for medical or other reasons is relevant to this credibility determination. Indeed, Danner testified that she was medically retired from USP Lewisburg at least in part due to trauma resulting from sexual harassment and discrimination she faced there. (Tr. 41-42). Thus, while the ALJ did not reject her statements about her symptoms for this reason alone, there was no error in considering the circumstances surrounding the end of her employment in assessing the overall credibility of her statements.

Simply put, the plaintiff's attack on the ALJ's symptom analysis is, at bottom, a request that this court re-weigh the evidence. This we may not do. See Chandler, 667 F.3d at 359 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations"); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude there was no error in the ALJ's evaluation of Danner's symptoms.

### 2.  **The ALJ's Assessment of the Opinion Evidence was Deficient, but the Error Was Harmless.**

We next turn to the plaintiff's argument that the ALJ's assessment of the medical opinion evidence was error. As we prefaced above, we agree that the ALJ's brief, cursory treatment of the opinions of these two State agency experts failed in some narrow respects to meet the articulation standards required by the regulations. In reaching this conclusion we find ourselves at the intersection between two well-settled paradigms in the Social Security field. First, our highly deferential standard of review empowers "[t]he ALJ – not treating or examining physicians or State agency consultants – [to] make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Thus, our decision in this case in no way undercuts the legal tenet that an ALJ is not required to adopt every limitation opined by the experts but "can formulate an RFC based on different parts from the different medical opinions." Durden, 191 F.Supp.3d at 455. However, at base, an ALJ must draft a reviewable opinion that is grounded in the evidence and provides the court with an adequately articulated and well-reasoned rationale for the limitations adopted.

Here, the brief, cursory manner in which the ALJ addressed these two medical opinions fails to meet this basic standard of articulation for at least two reasons. First, in addressing these two opinions together in a single paragraph the ALJ failed to acknowledge or address the inconsistencies in these opinions, including the moderate limitations opined by Dr. Fretz in the spheres of understanding, remembering, or applying information and adapting or managing oneself and the opinion of Dr. Martin that Danner could perform only one-to-two-step tasks. Thus, the portions of each opinion the ALJ concluded were "generally persuasive" is unexplained. In our view, it was error for the ALJ to address the two State agency opinions, which reached inconsistent conclusions regarding the severity of the limitations posed by Danner's impairments, as one and conclude vaguely and summarily that these opinions were "generally persuasive" without explaining which parts of these inconsistent opinions were persuasive and which were not.

Moreover, in the past we have repeatedly concluded that "when a medical opinion is found persuasive and contains a limitation to one- and two-step tasks, the ALJ is obligated to either: (1) include the limitation in the RFC and limit the claimant to reasoning level one occupations, or, (2) identify the substantial evidence that the ALJ is relying on in rejecting the limitation." Cruz, 2025 WL 2813882, at *8. See also Whitney v. Bisignano, No. 4:24-CV-1950, 2026 WL 522922, at *10 (M.D. Pa.

43

Feb. 25, 2026);  Cruz v. Bisignano, No. 1:24-CV-1966, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025); Michelle M. v. Bisignano, No. 3:23-CV-02163, 2025 WL 2713737, at *7 (M.D. Pa. Sept. 23, 2025); Warren v. Dudek, No. 1:24-CV-635, 2025 WL 1168276, at *6 (M.D. Pa. Apr. 22, 2025);  Shipman v. Kizakazi, No. 3:22-CV-00636, 2023 WL 5599607, at *10 (M.D. Pa. Aug. 29, 2023). Here, the ALJ seemingly adopted the opinion of Dr. Martin, finding Danner experienced mild to moderate limitations in functioning, but failed to address or acknowledge Dr. Martin's statement that Danner could perform only one-to-two-step tasks. This was error.

However, we are enjoined to refrain from viewing these deficiencies in the abstract. Rather any errors in ALJ analysis must be considered in the factual context of the case and are subject to harmless error analysis. Thus:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: " 'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.' " Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.' " Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

Drozd v. Kizakaji, No. 1:21-CV-2063, 2023 WL 122387, at *11 (M.D. Pa. Jan. 6, 2023).

In this case, while we find that Danner has identified an ALJ error in failing to more clearly articulate which portions of the medical opinion evidence were persuasive and in failing to either incorporate or address Dr. Martin's one-to-two-step limitation, she has not shown that this error prejudiced her substantial rights by affecting the outcome of the proceeding, or undermining the perceived fairness,

integrity, or public reputation of the proceedings. On this score, Danner's argument runs afoul of an insurmountable obstacle: the undisputed Vocational Expert testimony indicates that even an incorporation of the most conservative limitations opined by these experts, including the one-to-two-step limitation, would not have eroded her ability to perform jobs that exist in significant numbers in the national economy. Therefore, any errors stemming from the incomplete articulation of the rationale for crediting only parts of both opinions is harmless where the ambiguity in the analysis of these opinions would not have affected the final conclusion that Danner could perform tasks that existed in the national economy.

Recognizing that the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination, and confronted with uncontested expert testimony which undermines any claim that any additional limitations opined by these experts would have changed the ultimate outcome in this case, we find the ALJ's error in failing to address these opinions in a more fulsome way was harmless on the unique facts of this case. Therefore, we are constrained to affirm that decision.

In closing, this case stands as an example of how the thorough and proper examination of a vocational expert at a hearing can compensate for the deficient analysis of medical opinion evidence in the ALJ's final decision, even when such

decisions mire us in the thorny briar of one-to-two-step limitations. Moreover, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Since the ALJ's symptom assessment in this case complied with the dictates of the law and was supported by substantial evidence, and any error in the medical opinion analysis was harmless, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and will affirm that decision.

## IV.   Conclusion

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying this claim will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 9, 2026